UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:21-CV-00147-GNS-LLK

CHRISTINA LOPEZ                                                                                          PLAINTIFF

v.

ABS LINCS KY, LLC
d/b/a CUMBERLAND HALL HOSPITAL                                                          DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 40). The motion is ripe for adjudication. For the outlined reasons, the motion is **GRANTED**.

**I.      SUMMARY OF THE FACTS**

Defendant ABS Lincs KY, LLC ("ABS") conducts business as Cumberland Hall Hospital ("CHH"), which is an acute psychiatric hospital in Hopkinsville, Kentucky, treating adult and minor patients with behavioral health issues. (Compl. ¶ 5, DN 1). Plaintiff Christina Lopez ("Lopez") served as the Director of Risk Management and Performance Improvement at CHH and "ensur[ed] compliance with [CHH] policies/procedures, The Joint Commission accreditation standards, Centers for Medicare & Medicaid Services regulations, and all applicable federal and state laws." (Compl. ¶¶ 6-7). Lopez was fired in April 2021. (Compl. ¶ 25).

Lopez initiated this action against ABS, alleging claims for wrongful termination under Kentucky and common law, claiming that she was terminated in retaliation for filing statutorily required reports with CHH management regarding two incidents: (1) a nurse manager allegedly striking a minor patient in October 2020 (the "October Incident"); and (2) sexual misconduct between two minor patients in March 2021 (the "March Incident"). (Compl. ¶¶ 11-15, 21-24).

When responding to the October 2020 report, CHH's Director of Human Resources Diane Maxson ("Maxson") allegedly suspended the staff member who reported the incident to Lopez, but CHH's CEO David Melear ("Melear") rescinded the suspension. (Compl. ¶¶ 18-19). As for the March 2021 report, CHH purportedly lambasted Lopez and her report, chastised her for an inappropriate investigation, and predicted her termination. (Compl. ¶ 23).

ABS moves for summary judgment against the claims. (Def.'s Mot. Summ. J., DN 40).

## II. JURISDICTION

The Court exercises subject-matter jurisdiction over this matter based upon diversity of citizenship. *See* 28 U.S.C. § 1332(a).

## III. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this lack of material fact is established, the burden then shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial"; the evidence, however, "is not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). If the record taken as a whole could not support a finding of fact in favor of the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## IV.     DISCUSSION

"Under Kentucky law, an employer may generally discharge an at-will employee 'for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Alexander v. Eagle Mfg. Co., LLC*, 714 F. App'x 504, 507 (6th Cir. 2017) (quoting *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)); *accord Grzyb v. Evans*, 700 S.W.2d 399, 400 (Ky. 1985). Notwithstanding express statutory grounds prohibiting discriminatory discharge, at-will termination is restricted by two exceptions for "grounds . . . [that] are so contrary to public policy as to be actionable": (1) "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment"; and (2) "when the reason . . . was the employee's exercise of a right conferred by well-established legislative enactment." *Grzyb*, 700 S.W.2d at 402 (citation omitted); *accord Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, 277 F. Supp. 3d 889, 911 (W.D. Ky. 2017).

Lopez alleges she was fired in retaliation "for complying with her legal duty to investigate and report patient safety issues" as defined in KRS 216B.165, in violation of the public policy underpinning the statute. (Compl. ¶¶ 28, 38, 40). KRS 216B.165 requires "an oral or written report" to be made if an "agent or employee of a health care facility . . . knows or has reasonable cause to believe that the quality of care of a patient, patient safety, or the health care facility's . . . safety is in jeopardy . . . ." KRS 216B.165(1); *see Foster v. Jennie Stuart Med. Ctr., Inc.*, 435 S.W.3d 629, 634 (Ky. App. 2013) ("Subsection one (1) of the statute mandates that an employee make an oral or written report of any problem that affects the quality of care of a patient or patient's safety."); *see also* KRS 216B.165(3) (prohibiting actions by a health care facility "which tends to discourage, restrain, suppress, . . . or discriminate against any agent or employee who in good faith reports . . . the circumstances or facts to form the basis of a report . . . .").

3

"In Kentucky, claims of retaliation involve a burden-shifting approach." *Benningfield v. Fields*, 584 S.W.3d 731, 738 (Ky. 2018); *see Ky. Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003) ("In a case where there is no direct evidence of retaliation, . . . the burden of production and persuasion follows the familiar *McDonnell Douglas* framework."); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (explaining the burden-shifting framework for claims pursuant to Title VII of the Civil Rights Act of 1964). First, the plaintiff must establish a prima facie case of retaliation by demonstrating: "(1) [the plaintiff] engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Benningfield*, 584 S.W.3d at 738-39 (quoting *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915 (Ky. App. 2006)); *accord Ramirez*, 277 F. Supp. 3d at 912.

If the plaintiff proves a prima facie case, "the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Benningfield*, 584 S.W.3d at 739 (citation omitted); *accord McDonnell Douglas Corp.*, 411 U.S. at 802. "The [employer] bears only the burden of production and this involves no credibility assessments." *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). Thereafter, "the burden then shifts back to the employee to demonstrate that this reason was merely a pretext for retaliation." *Benningfield*, 584 S.W.3d at 739 (citation omitted); *accord Ky. Dep't of Corr.*, 123 S.W.3d at 134 ("To meet her burden of persuasion, the plaintiff 'must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were only a pretext for [retaliation].'" (alteration in original) (quoting *Reeves*, 530 U.S. at 143)).

There is no dispute that Lopez engaged in a protected activity when she reported the October Incident. (Def.'s Mot. Summ. J. 16-22; Pl.'s Resp. Def.'s Mot. Summ. J. 15-16, DN 42 [hereinafter Pl.'s Resp.]). Lopez avers that her March 2021 report was also a protected activity, but ABS asserts that the report was not protected because Lopez failed to prepare the report timely and accurately. (Def.'s Mot. Summ. J. 17-22; Pl.'s Resp. 15-16). Although KRS 216B.165 does not impose timeliness or accuracy limitations, CHH submits that its policies required that the March Incident be reported to the regional risk manager, Betsy Wolfe ("Wolfe"), within twenty-four hours.[1] (Def.'s Mot. Summ. J. 21; *see* Wolfe Dep. 14:3-15:25). Notwithstanding alleged facility policy violations, Lopez's reporting of the March 2021 event was a protected activity. *See MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 599 (W.D. Ky. 2015) ("[T]here is no requirement in KRS § 216B.165(1) that an employee who reports an unsafe situation be the first or only employee to make a report. The statute protects an 'employee who in good faith reports' – not the first employee who reports." (quoting KRS 216B.165(1), (3))).

"In cases where there is no direct evidence of a causal connection [between protected activity and termination], the causal connection of a *prima facie* case of retaliation must be established through circumstantial evidence." *Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 804 (Ky. 2004) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). Circumstantial evidence is "evidence sufficient to raise the inference that [the]

---

[1] Lopez points to facility risk manager training materials documenting CHH's four-tiered level-based reporting system, ranging from least (Level 1) to most significant (Level 4), to characterize incidents at the facility. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 17, at 2, DN 42-17; *see also* Wolfe Dep. 24:20-23, Oct. 24, 2022, DN 47-1). Sexual misconduct such as "[p]hysical contact of a sexual nature" is classified as Level 2, but "any violation[s] of law or regulatory authority" are considered Level 3 "regardless of evidence of patient injury." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 17, at 2; *see* Wolfe Dep. 47:13-16; *but see* Wolfe Dep. 58:24-59:6). Events that may become Level 3 or 4 must be reported to Wolfe within twenty-four hours. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 17, at 1; Wolfe Dep. 14:3-15:25, 21:10-17).

5

protected activity was the likely reason for the adverse action" and generally "requires proof that (1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action." *Id.* (alteration in original) (citations omitted). "Generally, there is no bright-line rule as to how close in time an adverse employment action must be to an employee's protected activity to show causal connection by temporal proximity alone." *Hughes v. Norton Healthcare, Inc.*, No. 2019-CA-0222-MR, 2020 Ky. App. Unpub. LEXIS 794, at *27 (Ky. App. Dec. 11, 2020). Even then, "a close temporal proximity alone may be sufficient to raise the inference." *Ky. Dep't of Corr.*, 123 S.W.3d at 135 (citation omitted); *accord Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such as temporal proximity between the events is significant enough to constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation."). "The sooner adverse action is taken after the protected activity, the stronger the implication that the protected activity caused the adverse action, particularly if no legitimate reason for the adverse action is evident." *Dollar Gen. Partners*, 214 S.W.3d at 916 (quoting *Ky. Dep't of Corr.*, 123 S.W.3d at 135); *cf. Singfield v. Akron Metro Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a three-month span between the protected activity and adverse employment action was sufficient to demonstrate close temporal proximity for a prima facie showing of causal connection). The Kentucky Court of Appeals has cautioned, however:

> "Close temporal proximity" does not mean that the employee must be terminated within days or even weeks of the [protected activity] . . . . Such a requirement would shield the employer from liability by merely waiting months or even years to terminate the employee. The logical approach is for the court to view the time between the two events in the context of the entire circumstances.

6

*Dollar Gen. Partners*, 214 S.W.3d at 916.

Lopez first identifies her report of the October Incident in 2020, in which a staff member struck a minor patient, as a retaliatory basis for her termination. (Compl. ¶¶ 11-17). ABS does not contest that it knew of Lopez's reports or that she suffered an adverse employment action in April 2021. (*See* Def.'s Mot. Summ. J. 17-22). Instead, ABS contends that Lopez's October 2020 report has no causal connection to her termination, considering six months had elapsed and Lopez had reported between 900 and 1,200 other incidents subsequent that report. (Def.'s Mot. Summ. J. 16-18; *see* Lopez Dep. 66:17, Aug. 1, 2022, DN 44-1 (noting that Lopez investigated and reported an average of 150 to 200 incidents per month)). This six-month gap requires the consideration of "other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525 (citation omitted). When an employee is subjected to increased scrutiny after a protected activity, "[t]he combination of this increased scrutiny with the temporal proximity of [the plaintiff's] termination . . . is sufficient to establish the causal nexus needed to establish a prima facie case." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009); *cf. Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007) (noting that an employer cannot "wait[] for a legal, legitimate reason to fortuitously materialize, and then use[] it to cover up his true, longstanding motivations for firing the employee [].").

Lopez details a timeline of increased scrutiny against her by Melear and Maxson after the October 2020 report, including a January 27, 2021, email from Maxson to Melear allegedly conveying Maxson's frustrations with Lopez's report and her characterization of the report as "overblown" and a "witch hunt"; a January 28, 2021, meeting between Melear, Maxson, and CHH's Director of Clinical Services Cha'Reme Campbell ("Campbell") about Lopez's employment and Lopez's reports questioning Campbell's qualifications; a February 2, 2021, email

from Maxson to Melear about a policy violation involving Lopez bringing cookies to the facility; and actions by Melear in March and April 2021 pertaining to Lopez's alleged disclosure of patient information in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). (Pl.'s Resp. 18).

Considering the context of these events, however, undermines the purported causal connection between Lopez's October 2020 report and her termination. Certainly, Maxson submitted a sheet of notes detailing her grievances with Lopez, including comments that "Lopez appears to have a lot of staff afraid of her in some capacity. If they do not 'play by her rules' she will start a Witch Hunt on them." (Melear Dep. Ex. 17, at 2; *see also* Maxson Dep. 52:10-22, July 27, 2022, DN 45-1 (noting that Maxson created this list of her own volition and that Melear did not request these comments)). Regardless, Maxson did not ultimately recommend Lopez's termination, nor did Melear consult Maxson when making that decision. (*See* Melear Dep. 102:20-103:9).

With respect to the January 2021 meeting between Melear, Maxson, and Campbell, the record demonstrates hostility between Lopez and Campbell, which led to multiple meetings about needing the two of them to cooperate and resolve any tension that existed. (*See* Maxson Dep. Ex. 14; Melear Dep. 70:10-78:2; Lopez Dep. 33:15-36:9, 50:4-53:21). Melear had "got[ten] involved several times in the conflict," which he called "extensive," and had "met with them together [to] let them know if they didn't fix the conflict, that they needed to." (Melear Dep. 71:21-23). Notably, there were questions of whether a charge of hostile work environment needed to be filed concerning Lopez and Campbell's treatment of each other. (*See* Melear Dep. 73:3-22). Lopez and Campbell's conflict "was growing . . . internally in the hospital," so Melear decided to investigate the hostility and "attempt to [] mitigate the conflict." (Melear Dep. 72:4-9). The

tension between Lopez and Campbell, however, does not appear related in any way to the October Incident in 2020 reported by Lopez.

With regard to the "cookie incident", Maxson explained that Lopez brought Girl Scout cookies to CHH to sell, which Maxson reported to Melear was against policy. (*See* Maxson Dep. Ex. 16, DN 45-1). Another employee had brought in candles to sell, which Maxson ultimately stopped for being contrary to policy. (Maxson Dep. Ex. 16). When describing this to Melear, Maxson commented that Lopez contested it was an issue because "she's always done it" and that Maxson told Lopez it "was a corporate directive and she cannot do [it], nor can anyone sell anything inside the building." (Melear Dep. Ex. 17, at 2). Regardless, Melear gave Lopez permission to continue, as he did not know it was against policy. (Melear Dep. 82:20-83:8).

Another incident involved a telephone call Lopez received from a former CHH employee regarding a potential HIPAA violation in which two CHH employees allegedly discussed patient information at a restaurant with other former CHH employees, in addition to the CHH employees displaying rude and unprofessional behavior by disparaging Lopez and other staff members. (*See* Maxson Dep. Ex. 18, at 1-2). The person reporting this conversation originally called Lopez and discussed the matter before calling a company hotline for this purpose. (Maxson Dep. Ex. 18, at 1-2, 8-10). Despite being informed of a potential HIPAA violation, Lopez did not report or follow-up on this complaint, which was subsequently investigated by Melear and Maxson. (*See* Maxson Dep. Ex. 18, at 10). When interviewed concerning the call and the report Lopez received concerning the HIPAA incident, Lopez said that the report was made to her as the risk manager, not as the caller's friend. (Melear Dep. 89:13-16). Maxson told Melear that she was responsible for not following-up on the complaint "because [Maxson] told Lopez not to worry about the call" and that Maxson would handle it. (Maxson Dep. Ex. 18, at 10; Melear Dep. 89:13-90:4). Melear

9

explained that Maxson did not have that authority and Lopez should have known the correct HIPAA reporting policy, which required Lopez to work with the facility's privacy officer to create a HIPAA breach worksheet. (Melear Dep. 89:13-91:4). The HIPAA investigation was based upon an independent complaint of a potential violation, and Lopez was interviewed only as to her knowledge and involvement with that incident. This investigation does not appear support the claim that Lopez was subjected to increased scrutiny following her October 2020 report. Wolfe noted she was not involved with the events underlying Lopez's October 2020 report and commented that the incident was handled at the facility level. (Wolfe Dep. 18:5-11).

Thus, considering "the time between the two events in the context of the entire circumstances," there is no evidence to support a causal connection between Lopez's October 2020 report and her termination in April 2021. *See Dollar Gen. Partners*, 214 S.W.3d at 916. As such, Lopez has not demonstrated a prima facie case with respect to the October 2020 report.

ABS cites as the basis for its termination of Lopez the March Incident in 2021 which occurred at CHH and concedes this incident was temporally proximate to the termination of Lopez on April 13, 2021. (*See* Melear Dep. Ex. 25); *Ky. Dep't of Corr.*, 123 S.W.3d at 136; *MacGlashan*, 84 F. Supp. 3d at 601. Lopez has therefore established her prima facie case as to her reporting of the March Incident. Accordingly, the burden now shifts to ABS "to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Benningfield*, 584 S.W.3d at 739 (citation omitted).

ABS explains that Lopez's conduct establishes multiple policy violations supporting her termination. (Def.'s Mot. Summ. J. 18-22). On March 20, 2021, Lopez conducted rounds throughout the CHH facility and was informed that male and female adolescent patients were congregating in mixed groups. (*See* Lopez Dep. 86:21-88:1, 89:22-90:1, 91:20-92:4). Lopez

10

entered a room with an unsupervised group of twelve-to-fifteen minor patients, male and female, and several patients who were under the age of twelve. (Lopez Dep. 88:2-7, 92:22-93:21). Lopez remained with the group for approximately twenty minutes before exiting the room, leaving the group unsupervised. (Lopez Dep. 91:4-9, 96:23-97:2). During that time, Lopez did not try to separate any of the patients. (*See* Lopez Dep. 108:23-24 ("Had I known something was going on, I would have separated them sooner."); Wolfe Dep. 78:21-79:1). Lopez told a nearby mental health technician that someone needed to monitor the patients, which she reiterated to a supervisor within the next hour. (Lopez Dep. 91:8-92:16, 97:3-98:25). Lopez did not, however, follow up or otherwise confirm that the group was monitored after she left. (*See* Lopez Dep. 101:12-102:10). At some point after Lopez left the room, an adolescent patient began self-harming and conveyed that her triggering event was an incident which occurred in the room Lopez had entered and left, in which a thirteen-year-old female patient and a seventeen-year-old male patient had engaged in over-the-clothes sexual touching. (Lopez Dep. 102:19-103:18). Lopez reviewed some video footage, though it is unclear whether Lopez had watched the full footage or only a segment and whether Lopez reviewed one or both available camera angles. (Lopez Dep. 103:21-104:23, 106:9-15; *see also* Wolfe Dep. Ex. 2, at 2). Lopez spoke with the thirteen-year-old patient, who reported the contact as over-the-clothes, and the seventeen-year-old patient, who denied all contact. (Lopez Dep. 104:19-105:14). Based on this information, Lopez concluded that the events were consensual and over-the-clothes, so she classified the incident as Level 2 and did not report it to Wolfe at corporate risk management. (*See* Lopez Dep. 110:1-111:7, 113:2-115:8, 143:2-11).

ABS maintains that Lopez violated several CHH policies stemming from her knowledge of and belated actions to investigate the sexual misconduct related to the March Incident. (Def.'s Mot. Summ. J. 18-22). These policies include the separation of male and female adolescent

patients at the facility.  (*See* Lopez Dep. 40:14-43:13).  If the adolescent patients could not be separated, then a staff member at CHH was supposed to remain in the room with the patients.  (*See* Lopez Dep. 43:14-44:5).  Moreover, adolescent patients and patients under the age of twelve were not to intermingle, and specific protocols were in place to prevent this interaction to mitigate potential risks and avoid compliance and liability issues.  (*See* Lopez Dep. 41:16-43:21, 93:22-94:6).  Any reports of patients engaging in sexual contact were required to be relayed to corporate risk management within twenty-four hours.  (Melear Dep. 104:11-105:5 (indicating that this report is to be made regardless of whether the event appears to be classified as Level 2)).  Lopez generally would investigate such allegations, and only she and Melear had access to review internal surveillance video.  (Lopez Dep. 44:20-45:18).  Even if Lopez was not present at the facility at the time of reported patient sexual conduct, she would typically assist investigations over the phone and would take over and continue the investigation upon her return to the facility.  (Lopez Dep. 44:20-46:19).

Lopez maintains that she did not finalize her investigation of the March Incident until Monday, March 22, 2021, when she returned to the facility.  (Lopez Dep. 115:21-116:4).  Upon her return, several members of senior management at CHH maintained that the events constituted rape and that the seventeen-year-old male patient should be discharged and transported to jail.  (Lopez Dep. 116:5-14).  Lopez continued to investigate by reviewing the video segment, which she believed to be the entirety of the event, and "did not see anything different" to merit characterizing the event above a Level 2.  (Lopez Dep. 120:8-14).  Lopez did not report the March 20 events to corporate risk management at any point before March 22, 2021.

On March 23, 2021, Lopez learned that the seventeen-year-old male patient had exposed himself under the table and that the thirteen-year-old female patient touched and masturbated the

seventeen-year-old patient's exposed genitals in view of the other minor patients left unattended in the room. (Lopez Dep. 107:19-109:17). Lopez insists that she first discovered this new segment of video while on the phone with Wolfe, which escalated the event to Level 3. (Lopez Dep. 120:19-121:2, 123:5-9; *see also* Wolfe Dep. 45:22-24 (Lopez commented that the video "[g]oes on longer than I thought" when rewatching on March 23, 2021)).

> Lopez was ultimately terminated because she:
>
> investigated the incident while on site and concluded that the video did not warrant communication or report[;] [] did not see the urgency of a room of patients being left unattended, as evidenced by her leaving the patients unattended after speaking with them[;] . . . failed to report the event appropriately[;] minimized this significant incident by not reporting it to her supervisor, by stating that the minor aged patient 'wanted to do it', and by failing to thoroughly review the incident despite ongoing concerns voiced by other senior leaders.

(Melear Dep. Ex. 25, at 1). Lopez's employee action report also relates to conduct by Lopez directed at a new employee such as "using an aggressive tone and roll[ing] her eyes"; presenting "a negative demeanor"; and "approach[ing] the new hire [] in an intimidating manner." (Lopez Dep. 133:20-134:8; Melear Dep. Ex. 25). Melear worked with corporate human resources, not including Maxson, and considered Wolfe's recommendation in deciding to terminate Lopez. (Melear Dep. 102:20-103:9).

ABS has presented a non-retaliatory basis for Lopez's termination for policy violations related to her handling of the March Incident, but separate from her belated report of that incident. Instead, ABS contends that it did not fire Lopez because she reported the incident, but that her report was late and inaccurate. Accordingly, Lopez bears the burden of demonstrating that ABS' grounds were pretext for retaliation by showing: "(1) the proffered reasons are false; (2) the proffered reasons did not actually motivate the decision; and (3) . . . the reasons given were

13

insufficient to motivate the decision." *Williams*, 184 S.W.3d at 497 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Ultimately, Lopez disputes whether the responsibility for these events rests on her or on Melear, the person purportedly responsible for understaffing issues at CHH. (*See* Pl.'s Resp. 15-16). Even taken as true, however, Lopez does not claim that ABS' grounds for her termination were false, were not the actual motivation, or were insufficient to motivate the decision. (*See* Pl.'s Resp. 15-19). Melear and Wolfe did not believe that Lopez was unaware of the full extent of the March Incident, but her failure to separate the patients undermined their faith that Lopez was able to perform her job duties. As Melear explained, "[t]he fact that a level was given based upon a very quick conclusion that nothing occurred that was reportable" was clearly erroneous. (Melear Dep. 95:10-12; *cf.* Wolfe Dep. 56:20-21; Wolfe Dep. Ex. 3, DN 47-1). Melear disputes Lopez's supposed difficulty in finding the video of the incident, as he "pulled up the camera system and was able to immediately find skin to skin contact of a hand to a penis." (Melear Dep. 93:4-6). Melear testified he was able to find "approximately two hours [of video] where touching had taken place over this period, and [] found it fairly easily, fairly, you know, rapidly." (Melear Dep. 95:6-9).

Wolfe took notes during her conversation with Lopez on March 23, 2021, documenting that Lopez's comments and tone insinuated "[she] was trying to talk her way out of this" and "kind of play acting" when discovering the purportedly new parts of the video. (Wolfe Dep. 40:11-42:18; *accord* Wolfe Dep. Ex. 2; Wolfe Dep. Ex. 3). Wolfe did not believe Lopez's explanation and that she was "[c]overing for not identifying [the incident] appropriately at the time." (Wolfe Dep. 43:18-23; *see* Wolfe Dep. 49:9-12; Melear Dep. 95:2-96:1). Wolfe testified that she was told by a corporate nursing representative that there was more to the incident than reported by Lopez

14

and that Lopez only offered to watch the video after Wolfe continued to seek from her details of the sexual interaction between the two minor patients. (Wolfe Dep. 31:16-32:14, 42:10-14).

Even the guidance material provided by Lopez listed "any violation[s] of law or regulatory authority" as Level 3 events under CHH policy, requiring reports to Wolfe within twenty-four hours, and indicating a risk manager dealing with an event that may be classified as a Level 3 or 4, was supposed to contact corporate risk management within twenty-four hours. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 17, at 2; Wolfe Dep. 24:10-25:23). Lopez acknowledges that the female patient, being thirteen years old, was incapable of consent to her sexual activity with the other patient. (Lopez Dep. 117:10-11); *see* KRS 510.020(3)(a) (providing that a person under the age of sixteen is incapable of consent); (*but see* Lopez Dep. 118:7-12 ("[L]egally, she cannot give consent due to her age, but I do believe that she agreed to this. I do believe that this was cooperative. I don't believe that she was forced in any way, shape or form. I don't believe that she was coerced.")). Despite her coworkers' protests that the incident constituted rape, Lopez acknowledges the event involved sexual contact with a patient who was too young to consent to the sex act. (Lopez Dep. 118:13-23, 126:10-127:2; *see* Lopez Dep. 48:3-10 (conceding that CHH's policy for sexual contact includes the fondling of genitals). Because the incident clearly involved sexual contact between two minor patients at CHH, there is no question that Lopez should have reported the incident to the regional risk manager, Wolfe. Lopez did not report this event to Wolfe within that twenty-four-hour period, nor did Lopez do so within seventy-two hours of the incident. (*See* Lopez Dep. 113:2-115:8).

It is not the responsibility of this Court to act as a super personnel board to second-guess the business judgment of ABS in deciding to fire Lopez. *See Haughton v. Orchid Automation*, 206 F. App'x 524, 534 (6th Cir. 2006) (noting that "Title VII was not intended to diminish

15

traditional management prerogatives," and courts "cannot sit as a super-personnel department." (internal quotation marks omitted) (internal citation omitted) (citation omitted)). Lopez has not established that ABS' grounds for termination were pretextual or in retaliation for her reporting. *See Benningfield*, 584 S.W.3d at 738-39; *Ky. Dep't of Corr.*, 123 S.W.3d at 134; *Dollar Gen. Partners*, 214 S.W.3d at 915. Given the nature of the incident involving a sex act between minors at a psychiatric hospital in plain view of other minor patients, no reasonable jury could find that ABS' termination for Lopez's belated report was pretextual. Lopez has likewise not demonstrated that her termination was due to her "exercise of a right conferred by well-established legislative enactment[,]" so her public policy claim also fails. *Grzyb*, 700 S.W.2d at 402 (citation omitted); *see also Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 898 (Ky. 2012); *Ramirez*, 277 F. Supp. 3d at 911. As noted above, Lopez was not fired because she reported the event, but because she *did not* make her report to the risk manager in a timely fashion. Accordingly, ABS' motion for summary judgment is granted.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (DN 40) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

August 29, 2023

cc: counsel of record